UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM MOGCK,

                    Plaintiff,

v.

UNITED WHOLESALE MORTGAGE, LLC,

                    Defendant.

Case No. 26-cv-10733
Hon. Terrence G. Berg
Mag. Elizabeth A. Stafford

**REPLY IN SUPPORT OF UNITED WHOLESALE MORTGAGE, LLC'S MOTION TO DISMISS AND STRIKE CLASS ALLEGATIONS**

## I.      THE BROKER AGREEMENT NEGATES AGENCY.

The fatal flaw in Plaintiff's Opposition is that it treats brokers as if they are UWM's telemarketers *required* to send texts on UWM's behalf. But the UWM Broker Agreement plainly contains no such requirement; to the contrary, it absolves brokers of having to *generate any loans for UWM*. (Agr. ¶ 7.03.) As a necessary corollary, UWM does not, and cannot, expect brokers to send any texts on its behalf.

As if this were not enough, the Agreement tells brokers they are not UWM's agents (¶ 7.04), prohibits brokers from holding themselves out as UWM agents (¶ 7.04), and prohibits use of UWM's name in advertising without written consent (¶ 7.11).[1] While UWM may offer certain tools to brokers, they are optional (¶ 7.11 ("broker *may* utilize features of UWM's Platforms") (emphasis added)), and not alleged to have been used here. The Agreement cannot be read to suggest that "UWM hired its brokers to telemarket UWM's mortgage products." (Opp. at 7.)[2]

Plaintiff next argues that the provisions requiring brokers to comply with all applicable law (¶ 3.03) and labeling them as independent contractors (¶ 7.29) are not

---

[1] Plaintiff argues that ¶ 7.11 allows brokers to identify UWM when required by law. (Opp. at 12.) But given that the Agreement prohibits calls from being made "on behalf of" UWM (Agr. ¶¶ 3.01(a), 7.04, 7.11), 47 C.F.R. § 64.1200(d)'s requirement to identify an entity on whose behalf the calls are made does not apply.

[2] Plaintiff selectively cites ¶ 2.02 (requiring brokers to follow UWM's practices and procedures) and ¶ 7.09 (audit rights). (Opp. at 9.) These provisions relate to loan origination and underwriting procedures, and do not suggest control over day-to-day operations. *See* cases cited in Footnote 5 *infra*.

1

dispositive. (Opp. at 10, 12-13.) That may be so where plaintiff otherwise plausibly alleges that defendant controlled the texts. (Opp. at 12, citing *Aranda*.) But here, the Complaint does not identify facts sufficient to sustain the three types of agency. And courts routinely dismiss claims at the motion to dismiss stage relying on similar contractual provisions regarding lack of agency, lack of power to use name and logo, and required compliance with the law.[3]

Plaintiff urges the Court not to consider the Agreement because it is unauthenticated and unsigned. (Opp. at 9 n.4.) But Plaintiff himself clearly relied on the Agreement in alleging that UWM "engages mortgage brokers" and "prohibits its brokers from submitting loans" to two competitors. (Compl. ¶¶ 24–25.) If Plaintiff used the Agreement to draft the Complaint, UWM should be able to rely on it too.[4]

---

[3] Mot. at 11 n.6; *Kern v. VIP Travel Servs.*, 2017 WL 1905868, at *6 (W.D. Mich. May 10, 2017) (vicarious liability claim dismissed where contract characterized the caller as independent contractor and required compliance with applicable law); *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 372 (6th Cir. 2015) (where contract designates parties as independent contractors without authority to make representations on defendant's behalf, such "contractual language flies directly in the face of the classic definition of common-law agency"); *Callier v. Wide Merch. Inv., Inc.*, 671 F. Supp. 3d 736, 745 (W.D. Tex. 2023) (vicarious liability claim dismissed because contract identified caller as independent marketing/referral agent and prohibited use of defendant's logo or trade name); *Canary v. Youngevity Int'l, Inc.*, 2019 WL 1275343, at *7 (N.D. Cal. Mar. 20, 2019) (TCPA claims dismissed where defendant's policies classified distributors as independent contractors).

[4] The Agreement is referenced and integral to the Complaint and thus properly considered. *Gulfside Casino P'ship v. Churchill Downs Inc.*, 861 F. App'x 39, 42-44 (6th Cir. 2021); *Andochick v. Byrd*, 2012 WL 1656311, at *3 (E.D. Va. May 9, 2012) (report properly considered when "central to the Plaintiff's claim" and at least implicitly referred to in the complaint). In this respect, the Agreement is akin to

2

***Training & Support Tools Do Not Establish Control.*** Plaintiff contends the brokers "agree to act on UWM's behalf and subject to its control" (Opp. at 8), but notably provides no citation for this proposition, which the Agreement rebuts. Plaintiff argues that UWM's training, sales meetings, "ChatUWMAssist" tool, and LeadPipeline software supply the needed "interim instructions" to establish control. (Opp. at 4, 8.) As noted above, however, Plaintiff mischaracterizes the optional tools and misapprehends the nature of UWM's relationship with brokers—who are UWM's ***clients***, not UWM's vendors. (UWM 10-K, ECF No. 9-2, PageID 111.)

Regardless, the tools and support UWM provides are not the sort of "interim instructions" needed to establish control over the "manner and means" of brokers' day-to-day operations or texts. *See* Mot. at 10-12; *Keating*, 615 F. App'x at 367, 373. These resources do not suggest, for example, that UWM could step in and redirect the broker's performance with respect to the texts; nor do they amount to UWM's control over the hours, methods, or means of sending the texts. Cases in franchise and other similar contexts are clear that trainings and access to technology do not

---

unsigned policies and procedures, which are routinely considered by courts on a motion to dismiss. *Pacheco v. Boar's Head Provisions Co*., 2010 WL 1323785 (W.D. Mich. Mar. 30, 2010); *see also Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 234 (2d Cir. 2016) (Amazon's Order Page and linked Conditions of Use properly considered where plaintiff's injuries were based on purchases made on Amazon, which were possible only via the Order Page).

establish control for agency purposes.[5] To the extent UWM imposes some requirements on brokers, those requirements relate to practices to ensure loan eligibility in the secondary markets. They do not establish control over brokers' day-to-day operations or the brokers' call techniques.

***Apparent Authority Theory Fails.*[6]** Plaintiff's apparent authority theory fails because such authority must be based on ***UWM's manifestations to Plaintiffs***, and ***Plaintiffs must have relied on them***. *Anderson v. Int'l Union, United Plant Guard Workers*, 370 F.3d 542, 551 (6th Cir. 2004). Identifying zero UWM manifestations to Plaintiff, Plaintiff reframes apparent authority as flowing from UWM's "manifestations" in the form of providing ***brokers*** with proprietary tools, authorizing ***brokers*** to send text messages, and sending ***brokers*** alerts to send messages. (Opp.

---

[5] *K.O. v. G6 Hospitality, LLC*, 728 F. Supp. 3d 624, 650 (E.D. Mich. 2024) (franchisor's control over policies and procedures at its brand hotels, on-site operational training, and required attendance at periodic conferences does not amount to control over actual day-to-day work); *S.C. v. Wyndham Hotels & Resorts, Inc.*, 728 F. Supp. 3d 771, 781 (N.D. Ohio 2024) (franchisor's brand standards "do not control franchisee hotels' day-to-day operations, such as hiring or firing employees, managing employee schedules, and other onsite management"); *Canary*, 2019 WL 1275343, at *6-8 (training does not equate to authority, and "granting permission to perform telemarketing does not mean that [defendant] exercised control over the entity that made the call"); *DeClements v. RE/MAX LLC*, 2020 WL 9259326, at *3 (D. Colo. Oct. 13, 2020) (encouraging franchisees to call prospects and use calling services does not amount to control over calls); *Usanovic v. Americana, L.L.C.*, 775 F. Supp. 3d 1133, 1140 (D. Nev. 2025) (trainings on how to make calls & where to purchase numbers/dialers do not establish actual authority).
[6] Plaintiff abandoned ratification by raising no opposition to UWM's arguments. *Humphrey v. U.S. Att'y Gen.'s Off.*, 279 F. App'x 328, 331 (6th Cir. 2008).

at 13-14.) The Court should also reject Plaintiff's argument that brokers' self-identification as "from UWM" establishes vicarious liability. (Opp. at 6-7.) Apparent authority depends on representations by the principal, not the agent.[7]

Plaintiff cites FCC's thirteen-year-old statement that a seller cannot avoid liability by outsourcing telemarketing to unsupervised third parties. (Opp. at 3.) But the texts at issue were not made by telemarketers, and the concerns animated by businesses hiring vendors to place calls for them are not present here. Rather, the texts here were sent by clients of UWM, offering various products to meet their own clients' (i.e., consumers') goals. (Mot. at 4-5.) While brokers may choose to deliver more loans to UWM than other companies after careful analysis of the borrowers' needs, they are not prevented from placing their business elsewhere.[8] In any event, convenience of suing a single party does not justify disregarding settled agency principles. And to the extent the FCC's 2013 Ruling expands federal common law principles of agency, courts reject it—particularly after *Loper Bright*. *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 779 (N.D. Ill. 2014) ("neither the FCC

---

[7] *Dobronski v. Juliasangel Mktg., LLC*, 2025 WL 2659265 (E.D. Mich. Sept. 17, 2025) (Berg, J.) (dismissing TCPA claims because "statements by agents are insufficient to create apparent authority"); *Cunningham v. Kondaur Cap.*, 2014 WL 8335868, at *7 (M.D. Tenn. Nov. 19, 2014) (dismissing TCPA claims despite allegations that callers were "prospecting leads for" defendant mortgage company).
[8] Plaintiff again references two companies to which brokers that sign the UWM Agreement cannot submit loans. However, Plaintiff does not deny that that leaves plenty of choices in the crowded residential loan origination market. (Mot. at 5 n.4.)

5

nor Plaintiffs" justified a departure from "established principles of federal agency law").

Plaintiff references the mortgagematchup.com website (Opp. at 4), but this website cannot establish apparent authority because Plaintiff does not allege that he relied on that website in any way. *Eight Mile Style, LLC v. Spotify USA Inc.*, 745 F. Supp. 3d 632, 657 (M.D. Tenn. 2024); *Anderson*, 370 F.3d at 551.

## II.   <u>TEXT MESSAGES ARE NOT ACTIONABLE UNDER § 227(C)(5).</u>[9]

The Opposition cannot dispute that § 227(c)(5) creates a right of action only for "telephone call[s]," not "messages" or "solicitations." 47 U.S.C. § 227(c)(5). Under *McLaughlin* and *Loper Bright*, the Court must apply the statute as written.

Plaintiff's reliance on *Keating* (Opp. at 16-17) is unavailing. In addition to being unpublished and thus non-precedential, *Keating* addressed § 227(b), not § 227(c)(5). *Keating* did not rely on FCC guidance construing § 227(c)(5). 615 F. App'x at 370. *Howard* does not help Plaintiff either. (Opp. at 17.) Its analysis of "call" is flawed and has been repeatedly rejected. *Stockdale v. Skymount Prop. Grp., LLC*, 2026 WL 591842, at *3 n.5 (N.D. Ohio Mar. 3, 2026); *James v. Smarter Contact, Inc.*, 2026 WL 879244, at *3-4 (M.D. Fla. Mar. 31, 2026). *Stockdale*—the only decision from a Sixth Circuit court after *Loper Bright*—is the better reading.

---

[9] Similarly, § 227(c) protects "residential telephone subscribers" and residential telephone lines—not cell phones, which Congress regulated in § 227(b). (*See* Mot. at 21-24, citing *Sunshine Consulting*, *Mims*, *Kapp*, *Gaker*, *Iniguez,* and *Polti*.)

6

The Opposition does not dispute that, regardless of how old the TCPA is, *McLaughlin* requires courts to interpret it "under ordinary principles of statutory interpretation," using the meaning fixed at enactment. (Mot. at 19.) Because text messaging did not exist in 1991, "telephone call" could not have included texts. Congress confirmed that distinction in 2019 by adding "text message" to § 227(e)(8)(C) while leaving § 227(c)(5) unchanged. *Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 383 (6th Cir. 2026). Even if the FCC applies DNC restrictions to "telephone solicitations or telemarketing calls or text messages to wireless telephone numbers" (Opp. at 16), § 227(c)(5) authorizes private suits only for "telephone calls." The FCC cannot enlarge that cause of action. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The substantial and growing body of post-*Loper Bright* authority supports UWM's position. Mot. at 19 n.10; *Irvin v. Sonic Indus. Servs.*, 2026 WL 1098403, at *3-5 (N.D. Ga. Apr. 20, 2026); *Wilson v. Tradecodes, LLC*, No. 1:25-cv-03211 (N.D. Ga. Mar. 17, 2026).[10]

Dated: June 8, 2026                                Respectfully submitted,

                                                   By: */s/ Irina Kashcheyeva*
                                                   Irina Kashcheyeva (P72575)
                                                   Amir El-Aswad (P86092)
                                                   *Counsel for Defendant*

---

[10] The proposed classes are also fail-safe, and Plaintiff has not come up with the cure. Regardless of objective criteria in other parts of the definition (which are present in other cases where classes were stricken as failsafe, *see, e.g., Boyer*), membership still turns on whether texts are sent from "anyone acting on Defendant's behalf." Courts strike similar class allegations. (Mot. at 7, 24-25.)

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2026, I caused to be electronically filed the foregoing paper with the Clerk of the Court, which will send notification of such filing to all counsel of record via the Court's ECF system.

By: */s/ Irina Kashcheyeva*
Irina Kashcheyeva (P72575)
Amir El-Aswad (P86092)
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
(313) 234-7100
(313) 234-2800
ikashcheyeva@foley.com
ael-aswad@foley.com
*Counsel for Defendant United*
*Wholesale Mortgage, LLC*